

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00422-CV

_____

IN THE INTEREST OF S.C., A CHILD

---

On Appeal from the 393rd District Court
Denton County, Texas
Trial Court No. 17-5158-393

---

Before Kerr, Pittman, and Birdwell, JJ.
Memorandum Opinion by Justice Pittman

# MEMORANDUM OPINION

Appellants E.C. (Father) and M.G. (Mother)—long-time methamphetamine users who continued to use methamphetamine after their newborn daughter Sallie's June 2017 removal and who used the drug just days before testifying at the December 2018 termination trial—appeal from the trial court's judgment terminating their parent-child relationships with Sallie and appointing Appellee the Texas Department of Family and Protective Services (TDFPS) her Permanent Managing Conservator (PMC).[1] After the termination trial, the jury found that termination of each parent-child relationship was in Sallie's best interest and that Mother and Father:

- knowingly placed or knowingly allowed [Sallie] to remain in conditions or surroundings which endangered [her] physical or emotional well-being . . . [;]

- engaged in conduct, or knowingly placed [Sallie] with persons who engaged in conduct, which endangered [her] physical or emotional well-being . . . [;]

- constructively abandoned [Sallie], who ha[d] been in the . . . temporary managing conservatorship of [TDFPS] for not less than six months, and (1) [TDFPS] ha[d] made reasonable efforts to return [her] to the parent[s]; (2) [they had] not regularly visited or maintained significant contact with [Sallie]; and (3) [they had] demonstrated an inability to provide [her] with a safe environment; and

---

[1] In this opinion, we use aliases to refer to the subject child, her biological and foster families, and the family the parents offered as a potential placement for her. *See* Tex. R. App. P. 9.8(b)(2) (requiring courts to use aliases to refer to minors in parental-rights termination cases and, if necessary to protect the minors' identities, to also use aliases to refer to their family members); *see also* Tex. Fam. Code Ann. § 109.002(d).

- failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain [Sallie's] return[,] . . . [when she had] been in the temporary managing conservatorship of [TDFPS] for not less than nine months as a result of [her] removal from the parent for abuse or neglect[.]

*See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (N), (O), (2). The trial court approved the findings and incorporated them into its order terminating the parents' rights.

In two issues, one with four subparts, Father contends (1) he was denied due process by (a) the denial of appointed trial counsel (Trial Counsel) for fifteen months and during critical stages of the proceeding; (b) the ineffectiveness of Trial Counsel; (c) the trial court's denial of a jury trial on the issue of conservatorship; or alternatively, (d) the trial court's refusal to submit a jury question on the issue of conservatorship (Issue One); and (2) that the evidence is legally and factually insufficient to support the best-interest finding against him (Issue Two). In one combined issue, Mother contends that "the trial court err[ed] in limiting the scope of conservatorship testimony available to the jury and by refusing to include conservatorship questions in the jury charge." Because we hold that the evidence is legally and factually sufficient to support the termination of Father's parental rights; that the trial court did not violate Father's rights to due process or abuse its discretion by appointing Father's Trial Counsel forty days before trial; that the trial court did not reversibly err by not having a jury trial on Sallie's conservatorship and by not

3

submitting the issue of Sallie's conservatorship to the jury; and that Father did not satisfy his burden to prove ineffective assistance of Trial Counsel, we affirm the trial court's judgment as to Father. Because we hold that Mother lacks standing to challenge alleged errors that could only affect Sallie's conservatorship, we dismiss Mother's appeal.

## BACKGROUND FACTS

### I. Mother Was a Chronic Methamphetamine User Who Continued to Use Methamphetamine After Sallie's Removal Until the Trial Almost Eighteen Months Later.

Sallie was not the first child removed from Mother's care because of her drug use. Mother's—but not Father's—son Charlie was born in 2013. To her recollection, he was removed about six months later because they both tested positive for methamphetamine; she had begun using methamphetamine when he was about six months old and kept her methamphetamine in his room. Charlie's paternal aunt Bettie and Mother agreed to an order naming Bettie his PMC.

Because of Charlie's positive drug test, Mother was placed on deferred adjudication community supervision for injury to a child; it was later revoked after she tested positive for methamphetamine possession multiple times, and she was convicted.

Mother met Father in May 2016; they were always "on and off." She became pregnant with Sallie. Mother estimated that she used methamphetamine more than thirty times during the pregnancy; her last methamphetamine use during her

4

pregnancy with Sallie occurred a day or two before her June 2017 delivery. Mother admitted that Father used methamphetamine with her but claimed that he did not use with her during her pregnancies. Sallie tested positive for methamphetamine at her birth and went to live with the foster parents (the Fosters) when she left the hospital three days later.

Mother and Father's second child, Annie, was born in August 2018 while this case was pending. Mother testified that she used methamphetamine weekly during that pregnancy, that Father lived with her, and that he did not know she was using methamphetamine during the pregnancy but she assumed "he questioned it." Like Sallie, Annie tested positive for methamphetamine at birth and was removed from the hospital. She too was placed with the Fosters. Annie is the subject of a separate proceeding.

Mother continued her drug use, using as recently as within a week of testifying at trial. She admitted that she had completed no court-ordered services except attending Narcotics Anonymous and Alcoholics Anonymous (AA) meetings and that she had not attended those meetings in the last month, had no sponsor, and could not remember the first step or explain the fourth step. Mother testified that:

- Mother and Father lived with Jeff, a fellow drug user;
- Mother did not know Jeff's last name;
- Mother did not have stable employment;

5

- Mother had endangered Sallie by using methamphetamine and hanging out with other drug users, including Father;

- Mother was not asking for Sallie's return;

- Placing Sallie with Mother would not be in Sallie's best interest;

- Mother's use of methamphetamine was not in Sallie's best interest; and

- The termination of Mother's parental rights was in Sallie's best interest.

II. **Father Was a Chronic Methamphetamine User Who Continued to Use Methamphetamine After Sallie's Removal Until the Trial Almost Eighteen Months Later.**

Father testified:

- He has convictions for methamphetamine possession and driving with a suspended license;

- He relapsed and began using methamphetamine again in 2012 after fifteen years of sobriety;

- He started using methamphetamine again because he was overweight and had bad sleep apnea and high blood pressure, but his insurance would not cover a lap band and his doctor would not prescribe a stimulant;

- He last used methamphetamine about five days before he testified at trial;

- He did not know that Mother had used methamphetamine while she was pregnant with Sallie;

- He used methamphetamine during that pregnancy but not in front of Mother;

- He and Mother did not live together all the time during her pregnancy with Sallie;

- He probably possessed methamphetamine when they did live together;

- He had probably used methamphetamine more than twenty but less than fifty times with Mother;

- He did not use methamphetamine with Mother when she was pregnant with Annie;

- He did not suspect Mother was using methamphetamine when she was pregnant;

- During the pregnancies, Father hoped Mother had stopped using drugs and she had told him that she had stopped;

- Mother did not act differently when she was high;

- He completed the psychological evaluation, began Fatherhood classes, and attended AA, but he admitted that he last attended an AA meeting six weeks earlier, had no sponsor, and had completed no steps;

- He did not complete any court-ordered services;

- He refused two drug tests during the case;

- He probably saw Sallie twenty times in eighteen months;

- His missed visits were his and CPS's fault;

- He and Mother were currently trying to quit using drugs;

- Addiction had affected his children's lives;

- He disagreed that he had endangered Sallie through his conduct or through the environment she had been in;

- He disagreed that children exposed to methamphetamine in utero can have long-lasting problems;

- He agreed that he failed to comply with the provisions of the trial court's temporary orders that set out the steps he needed to take to have Sallie returned;

- He agreed that Sallie had been in TDFPS's care for more than nine months;

- He disagreed that Sallie had been removed from his care for abuse or neglect;

- He would not take Sallie to Jeff's if TDFPS returned her to him;

- Father was not asking for Sallie's return;

- Father knew that his parental rights would be terminated; he was "not stupid"; and

- He did not think his rights should be terminated until his "girls [were] placed where [he thought was] best for the girls."

## III. The Parents Wanted Sallie to Live with Charlie's Aunt Addie.

Mother and Father did not want Sallie to be returned to their care but also did not want their rights to be terminated, both proposing conservatorship instructions contingent on "no" answers to best-interest questions. Instead, they wanted Sallie placed with Bettie's sister Addie so that Sallie could grow up near Charlie, Sallie's half-brother whom she met once before trial. By the time Mother and Father filled out placement forms, Sallie was five to six months old; by the time Addie was approved by TDFPS as a backup placement for Sallie, Sallie was approximately eleven months old. (CPS ultimately rejected Bettie as a placement for Sallie, in part because Addie had already been approved as a backup placement.) TDFPS conceded that the home-study process does not typically take as long as Addie's did.

## DISCUSSION

## I. Mother Has No Standing to Challenge Conservatorship.

In Mother's sole issue, she asks, "Did the trial court err in limiting the scope of

8

conservatorship testimony available to the jury and by refusing to include conservatorship questions in the jury charge?" She asks only for a new trial on an appropriate post-termination conservator. Mother has not appealed the trial court's findings terminating her relationship with Sallie and is therefore bound by those findings. *See In re Y.V.*, No. 02–12–00514–CV, 2013 WL 2631431, at *1–2 (Tex. App.—Fort Worth June 13, 2013, no pet.) (mem. op.). Mother has consequently become a former parent with no legal rights regarding Sallie *See id.*; s*ee also* Tex. Fam. Code Ann. § 161.206(b) ("[A]n order terminating the parent-child relationship divests the parent and the child of all legal rights and duties with respect to each other, except that the child retains the right to inherit from and through the parent unless the court otherwise provides."). With no legal rights regarding Sallie, Mother lacks standing to challenge alleged errors that could only affect post-termination conservatorship. *See Y.V.*, 2013 WL 2631431, at *1–2 (citing *In re H.M.M.*, 230 S.W.3d 204, 204–05 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (holding former mother did not have standing to appeal post-termination custody decision when she did not appeal the termination of her parental rights)); *see also In re A.N.A.*, No. 05-18-00169-CV, 2018 WL 2228624, at *1 (Tex. App.—Dallas May 16, 2018, no pet.) (mem. op.) (citing same). The cases Mother cites in her brief do not control our disposition of this issue because the parents in those cases also asked for relief regarding the termination of their parental rights, *see In re J.A.J.*, 243 S.W.3d 611, 615 (Tex. 2007); *Corrales v. Dep't of Fam. and Protective Servs.*, 155 S.W.3d 478, 481, 484–87 (Tex. App.—El Paso 2004, no

9

pet.); or the jury did not terminate their parental rights, *In re B.O.*, No. 02-16-00485-CV, 2017 WL 2590571, at *1 (Tex. App.—Fort Worth June 15, 2017, no pet.). We dismiss Mother's appeal. *See In re T.Y.*, No. 05-18-00287-CV, 2018 WL 3130652, at *1 (Tex. App.—Dallas June 25, 2018, pet. denied) (mem. op.); *A.N.A.*, 2018 WL 2228624, at *1–2.

## II. The Evidence is Legally and Factually Sufficient to Support the Termination of Father's Parental Rights.

### A. Father Has Forfeited Any Challenge to the Subsection (b)(1) Findings.

For a trial court to terminate a parent–child relationship, TDFPS must prove two elements by clear and convincing evidence: 1) that the parent's actions satisfy one ground listed in family code section 161.001(b)(1); and 2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802.

Father admits in his brief that in the trial court he "did not contest the predicate grounds for termination under at least one of TFC Sections 161.001(b)(1)(D)(E)(N) or (O)." In a footnote he states that he "understands that only one ground is required and does not contest the 161.001(b)(1)(O) grounds." But in that same footnote, Father:

denies that there is clear and convincing evidence that he[,] a male, used drugs while he was pregnant. He denies there is clear and convincing evidence that he placed the child anywhere or with anyone because she was taken directly from the hospital.

By not challenging any of the jury findings on the four (b)(1) grounds in the trial court, Father forfeited any appellate complaint about them. *See In re J.S.*, No. 02-18-00164-CV, 2018 WL 5833438, at *2 (Tex. App.—Fort Worth Nov. 8, 2018, pet. denied) (mem. op.) (relying on Tex. R. Civ. P. 324(b)(2)–(3); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003); *T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 220 (Tex. 1992)). Thus, to the extent Father's footnote attempts to somehow now for the first time challenge any of those findings, we overrule that unnumbered, unpreserved challenge. *See id.*[2]

---

[2]The Supreme Court of Texas recently held, "When a parent has presented the issue on appeal, an appellate court that denies review of a section 161.001(b)(1)(D) or (E) finding deprives the parent of a meaningful appeal and eliminates the parent's only chance for review of a finding that will be binding as to parental rights to other children." *In re N.G.*, No. 18-0508, 2019 WL 2147263, at *3 (Tex. May 17, 2019). In an abundance of caution, we note that even if Father had preserved at trial and raised and argued on appeal a challenge to the endangerment findings, the evidence—particularly Father's persistent methamphetamine use before and after Sallie's birth and during the entire pendency of the case—is legally and factually sufficient to support the jury's endangerment finding under subsection (E) by clear and convincing evidence. *See, e.g., In re J.W.*, No. 02-08-00211-CV, 2009 WL 806865, at *4 (Tex. App.—Fort Worth March 26, 2009, no pet.) (mem. op.).

**B.    The Evidence is Legally and Factually Sufficient to Support the Best-Interest Finding Against Father.**

In his second issue, Father contends that the evidence is legally and factually insufficient to support the best-interest finding against him. In determining whether evidence is sufficient to support a best-interest finding, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013).

To determine whether the evidence is legally sufficient to support the trial court's best-interest finding, we look at all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005); *see* Tex. Fam. Code Ann. § 161.001(b)(2). We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *J.P.B.*, 180 S.W.3d at 573. We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.*

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant them with our own. *In re*

*H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). Here, we review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that termination of Father's and Sallie's parent–child relationship would be in her best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient to support the best-interest finding. *C.H.*, 89 S.W.3d at 18–19.

> **1.  We Consider the *Holley* Factors in Reviewing the Best-Interest Finding.**

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). Evidence probative of a child's best interest may be the same evidence that is probative of a subsection (1) ground. *E.C.R.*, 402 S.W.3d at 249; *C.H.*, 89 S.W.3d at 28.

We also consider the evidence in light of nonexclusive factors that the trier of fact may apply in determining the child's best interest:

(A)  the child's desires;

(B)  the child's emotional and physical needs, now and in the future;

(C)  the emotional and physical danger to the child now and in the future;

(D)  the parental abilities of the individuals seeking custody;

13

(E)     the programs available to assist these individuals to promote the child's best interest;

(F)     the plans for the child by these individuals or by the agency seeking custody;

(G)     the stability of the home or proposed placement;

(H)     the parent's acts or omissions indicating that the existing parent–child relationship is not a proper one; and

(I)     any excuse for the parent's acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *E.N.C.*, 384 S.W.3d at 807. These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## 2.     The *Holley* Factors Support the Best-Interest Finding.

### a.     The Most Compelling Best-Interest Evidence for Termination is Father's Methamphetamine Use and Addiction.

The most significant best-interest evidence is the endangerment evidence. Father is a chronic abuser of methamphetamine, lives with other drug users, including Mother, and by his own admission was not anticipating or ready for Sallie to be returned to his care.

14

### b. The Fosters Were the Only Family Eighteen-Month-Old Sallie Had Known.

Although Sallie was too young to express her desires at trial, she was bonded to the Fosters. Abra Piacente, the TDFPS conservatorship worker since May 2018, described how Sallie was doing with the Fosters at the time of trial:

> She's doing very well in her placement. I have visited her several times there. She's very happy, very healthy. She's walking. She's attempting to talk. It's mostly gibberish, but you can understand some words here and there. She's extremely bonded to the other children that are in the home. I have seen her interact with the kids, the foster parents, and you can tell that there is a very strong relationship between everybody in that home.

In addition to fostering Sallie and Annie, the Fosters have two sons. Piacente testified that Sallie's interactions with the Fosters' children were just like those of siblings: They played with toys and took toys away from each other. They seemed very bonded and very happy. Mrs. Foster echoed that sentiment, testifying that Sallie looked at the Fosters' sons as her brothers.

### c. The Evidence Shows that the Fosters Were Meeting Sallie's Needs and Could Meet Her Future Needs.

TDFPS recommended termination and adoption by the Fosters. Conservatorship worker Piacente testified that termination was in Sallie's best interest and then explained why:

> Q. Is termination of both parents' parental rights in [Sallie's] best interest?
>
> A. Yes, it is.
>
> Q. How so?

15

A.     M[other] continued to engage in behavior that placed her child in danger. She used illegal substances while she was pregnant. She continued to use illegal substances after her child was born and in the care of [TDFPS]. She did not consistently see her child. She did not attempt to even address her substance abuse problem, even though [TDFPS] offered services to her, continues to . . . offer services to her at no cost to her. She continues to remain with people who also use illegal substances and she's not provided any stability for herself and she would not be able to offer any stability for her child.

Q.     Would your answer be the same for [Father]?

A.     It would, yes.

Piacente also testified:

- TDFPS's permanency plan for Sallie was to be her sole managing conservator until the Fosters could adopt her;

- It was in Sallie's best interest to remain with the Fosters;

- The Fosters wanted to adopt both Sallie and Annie;

- The Fosters wanted to set up sibling visits with Charlie, if possible; and

- Sallie's placement with the Fosters met all of her needs, including her medical needs.

TDFPS's London Thomas, the former conservatorship worker from July 2017 to May 2018, testified that she had no concerns about Sallie's care with the Fosters.

Mrs. Foster testified that Sallie was up to date on vaccines and all medical care and that she had no special needs. On cross-examination, Mrs. Foster explained that she does vaccinate and believes children should be vaccinated but had not vaccinated her older son because of his doctor's instructions.

16

Mrs. Foster testified that she had completed some college courses and that Mr. Foster has a college degree and worked in environmental health and safety. Mrs. Foster testified that she and her husband:

- Fostered six children in three years;

- Adopted their two sons, one almost five years old and one almost three years old, after fostering them;

- Treated Sallie as a member of the family;

- Wanted to adopt Sallie and Annie and intended to adopt them if the parents' rights were terminated; and

- Were willing to get the girls together with Charlie once or twice a month if they could coordinate with his PMC Bettie.

Mrs. Foster also testified that she did everything for Sallie and was with her all the time, that Sallie was a healthy eater, that Sallie shared a room with the younger son, and that Sallie also "adore[d]" Mr. Foster and was "extremely bonded" to him.

### d. That Father Supports an Alternate Placement for Sallie Does Not Compel the Conclusion that Terminating His Connection to Sallie Is Not in Her Best Interest.

Father rests his contention that the evidence is insufficient to support the best-interest finding and therefore to terminate his parental rights primarily on the availability of a potential placement for Sallie with Addie, Sallie's half-brother Charlie's aunt. Addie lived about fifteen minutes from her sister Bettie, Charlie's PMC.[3]

---

[3]To the extent Father argues that the evidence is also legally and factually insufficient to support the termination of Mother's parent-child relationship with

17

Mother had known Bettie and Addie seven years and talked to Bettie "every once in a while." Mother admitted that:

- She had never done or said anything to facilitate a visit between Charlie and Sallie;

- Mother had not requested a home study on Addie until "late in the case";

- Mother initially did not want to ask Bettie and Addie about placing Sallie with one of them; she did not tell Bettie until November 2017 that Sallie was in foster care;

- Bettie, Charlie's PMC, is a stranger to Sallie;

- Addie and Sallie had seen each other only two or three times during the pendency of the case; and

- If Sallie could not be placed with Addie, it would be in Sallie's best interest to stay with Annie (her biological sister who also lived with the Fosters).

Contrary to Mother's testimony, Father testified that they had turned in their caregiver resource forms naming Bettie and Addie soon after Sallie's birth. In November 2017, when Mother contacted Bettie and Addie, Father agreed to placing Sallie with one of them even though he did not speak with or meet either woman until later. He also testified that he eventually met Bettie and Addie four or five times and had seen their Facebook pictures and posts. Father testified that he would rather

Sallie, he has no standing to do so, and we dismiss any portion of his issue attempting to raise that complaint. *See D.F. v. Tex. Dep't of Fam. and Protective Servs.*, No. 03-16-00883-CV, 2017 WL 1315441, at *3–4 (Tex. App.—Austin Apr. 4, 2017, no pet.) (mem. op.); *In re T.N.*, 142 S.W.3d 522, 525 (Tex. App.—Fort Worth 2004, no pet.).

separate Sallie and Annie temporarily to get Sallie placed with Addie and that he hoped that all three children would be together ultimately—two in Addie's home and one in Bettie's home. Father testified that it was in Sallie's best interest for siblings to have frequent contact but admitted that his adult son, who lives in Denton, had never met Sallie. Father testified,

> I want my girls placed where I feel like they're going to be in the best care and seeing what I saw through [Mother's] son's eyes, the smile that—I mean, all the things and the opportunities that he's allowed, going to be granted over there is much greater than what I heard from the foster parents.

Father believed that there was no guarantee of sibling contact if the Fosters adopted Sallie (and later Annie) but that Addie's adopting them would guarantee sibling contact between the sisters and one of their half-brothers.

TDFPS conservatorship worker Piacente admitted that there was no guarantee that the Fosters would adopt Annie if they adopted Sallie but testified that the parents' plan that Sallie be placed with Addie was not viable because neither TDFPS nor the parents

> would . . . have any control over how much [the] siblings see each other [or] how the[y] would be brought up. There's . . . no control over that, and there's no guarantee if the jury didn't terminate their rights that [the parents] would relinquish their rights to somebody else.

Piacente also testified that the parents could not be trusted to do anything they said they would do.

Former conservatorship worker Thomas testified that at least one reason for not moving Sallie to Addie's home was the length of time that she had lived with the Fosters (her entire life less three days). Piacente testified that to her understanding, Addie was approved only as a backup if the Fosters would not or could not keep Sallie because of the length of time Sallie had been with the Fosters, the absence of a biological relationship between Addie and Sallie, and the fact that there is no sibling in Addie's home. Veronica Tackett, the program director for the relevant TDFPS conservatorship unit, also explained why Addie was approved only as a backup to the Fosters:

> We already had the child in a placement that the child had been in. The child was doing well. The child was stable. And we were only using this as a backup because they [Addie and her husband] were, to stretch the definition, a fictive kinship placement only, not an actual blood relative.

Addie testified that:

- She was a home health nurse but would very soon graduate with a master's degree in social work;

- Her husband was retired from the military; her four grown sons did not live at home;

- She lived on a ranch with horses, mules, chickens, and cows;

- A large extended family lived nearby;

- She saw Charlie daily, picked him up from daycare, and cooked supper for the extended family;

- Charlie was happy, very active, very talkative, and well adjusted;

- She and her husband had visited Sallie several times;

20

- Addie wanted to adopt Sallie and Annie;

- Addie could love the girls like they were biologically related to her;

- She would be open to sibling visits with their adult half-brother; and

- She admitted that she could not ensure contact with Charlie if the Fosters adopted Sallie because Bettie was his PMC.

Bettie testified that Charlie was close to Addie and that Addie was a big part of his life. She also said that if the Fosters were to get custody of Sallie, she would support Sallie and Charlie having an ongoing relationship.

As TDFPS employees Thomas and Tackett both testified and as the evidence supports, there is no reason to believe that Addie would not provide a safe and loving home. But that is not the ultimate issue and was not the issue for the jury. Sallie's ultimate placement is still pending. "[W]here a child will be placed is a factor in evaluating the child's best interest, but it is not a bar to termination that placement plans are not final or that placement will be with nonrelatives." *In re R.A.*, No. 02-18-00252-CV, 2019 WL 490121, at *9 (Tex. App.—Fort Worth Feb. 7, 2019, no pet.) (mem. op.). "Because [Sallie] had been in a stable, adoption-motivated foster home for such a long period of time, a [fictive kin] placement could have actually destabilized [her] li[fe]. Why parents would prefer a relative [or fictive kin] placement is self-evident, but determining best interest focuses on the child, not the parent." *Id.* at *10; *In re B.C.S.*, 479 S.W.3d 918, 927 (Tex. App.—El Paso 2015, no pet.); *see In re C.M.*, No. 02-17-00381-CV, 2018 WL 2123472, at *5 (Tex. App.—Fort Worth May 9,

21

2018, no pet.) (mem. op.) (citing *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ)). We also point out that the case discussed by Father, *In re B.D.A.*, 546 S.W.3d 346 (Tex. App.—Houston [1st Dist.] Feb. 8, 2018, pet. pending) (op. on reh'g), is distinguishable. In that case, TDFPS placed three siblings raised together in three separate homes. *Id.* at 355. In this case, Charlie and Sallie had met once, and Sallie and Annie, full biological sisters, both lived with the Fosters.

### 3. We Uphold the Best-Interest Finding Against Father.

Having reviewed all the evidence according to the appropriate standards of review, *see J.P.B.*, 180 S.W.3d at 573 (providing legal-sufficiency standard of review); *C.H.*, 89 S.W.3d at 18–19, 28 (providing factual-sufficiency standard of review), we hold that the evidence is legally and factually sufficient to support the jury's best-interest finding against Father and the termination of his parental rights to Sallie. We overrule Father's second issue.

## III. Father Was Not Denied Due Process.

In his first issue, Father argues that his rights to due process were violated by:

- the trial court's failure to appoint Trial Counsel for fifteen months and during critical stages of the proceeding;

- ineffective assistance of Trial Counsel, who "failed to file [Father's] affirmative defense or a counterpetition requesting the appointment of fictive kin [Addie] as [Sallie's] managing conservator, although that was [his] entire case"; and

22

- the trial court's denial of a jury trial on the issue of conservatorship or, alternatively, the trial court's refusal to submit a jury question on the issue of conservatorship.

## A. The Trial Court Did Not Violate Father's Rights to Due Process or Abuse Its Discretion by Appointing Father's Trial Counsel Forty Days Before Trial.

In his first subissue within his first issue, Father complains of the the trial court's delay in appointing Trial Counsel. Indigent parents have a statutory right to counsel in TDFPS-filed parental termination cases. Tex. Fam. Code Ann. § 107.013(a). Section 107.013(d) provides,

> The court shall require a parent who claims indigence under Subsection (a) to file an affidavit of indigence in accordance with Rule 145(b) of the Texas Rules of Civil Procedure before the court may conduct a hearing to determine the parent's indigence under this section. The court may consider additional evidence at that hearing, including evidence relating to the parent's income, source of income, assets, property ownership, benefits paid in accordance with a federal, state, or local public assistance program, outstanding obligations, and necessary expenses and the number and ages of the parent's dependents. If the court determines the parent is indigent, the court shall appoint an attorney ad litem to represent the parent.

*Id.* § 107.013(d). The parent seeking to establish indigence has the burden of proving it by a preponderance of the evidence. *In re G.S.*, No. 14-14-00477-CV, 2014 WL 4699480, at *20 (Tex. App.—Houston [14th Dist.] Sept. 23, 2014, no pet.) (mem. op.). "The test for determining indigence is straightforward: Does the record as a whole show by a preponderance of the evidence that the applicant would be unable to pay the costs, or a part thereof, or give security therefor, if he really wanted

23

to and made a good-faith effort to do so?" *In re C.H.C.*, 331 S.W.3d 426, 429 (Tex. 2011) (citations and internal quotation marks omitted).

We review the trial court's indigence determination for an abuse of discretion. *In re C.D.S.*, 172 S.W.3d 179, 184 (Tex. App.—Fort Worth 2005, no pet.). When to appoint counsel for indigent parents is also within the trial court's discretion. *In re J.L.*, No. 02-13-00058-CV, 2013 WL 3771334, at *2 (Tex. App.—Fort Worth July 18, 2013, no pet.) (mem. op.) (relying on *In re M.J.M.L.*, 31 S.W.3d 347, 354 (Tex. App.—San Antonio 2000, pet. denied)). *But see C.D.S.*, 172 S.W.3d at 185–86 (recognizing that section 107.013 does not require the immediate appointment of counsel for an indigent parent but holding that the trial court erred by failing to find mother indigent and by failing to appoint her counsel before the termination of her parental rights based on her voluntary relinquishment of parental rights more than eight months after she filed an application for appointed counsel and appeared in opposition to the removal of her child). "In determining whether a trial court abused its discretion, a reviewing court is generally bound by the record before the trial court at the time its decision was made." *In re M-I L.L.C.*, 505 S.W.3d 569, 574 (Tex. 2016) (orig. proceeding).

A trial court abuses its discretion if it acts without reference to any guiding rules or principles—that is, if its act is arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). An appellate court cannot conclude that a trial court abused its discretion

24

merely because the appellate court would have ruled differently in the same circumstances. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *see also Low*, 221 S.W.3d at 620.

A trial court also abuses its discretion by ruling without supporting evidence. *Ford Motor Co. v. Garcia*, 363 S.W.3d 573, 578 (Tex. 2012). But no abuse of discretion occurs when the trial court decides based on conflicting evidence, so long as some substantive and probative evidence supports its decision. *Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009); *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002) (op. on reh'g).

### 1. The Trial Court Did Not Abuse Its Discretion by Appointing Trial Counsel When It Did.

#### a. Father Did Not Prove His Indigence at the July 2017 Adversary Hearings.

Father presented an application for appointed counsel to the trial court on July 5, 2017. At the adversary hearing held that day, the trial court noted that the last income that Father verified to the trial court was $38,000, which the trial court stated meant that Father earned too much to qualify for appointed counsel.[4] Father's application listed an income "range" of $1,600-$2,800 per month, monthly expenses of $1,370, and a number of assets including a timeshare worth $7,000, a Nissan SUV

---

[4]We recognize that $38,000 is greater than the highest annual income calculations based on the monthly amounts in the affidavit. Father and the trial court appear to have begun their discussion off the record.

worth $3,000, and a travel trailer worth $5,000 that needed some work and on which he owed $1,500.

At the adversary hearing held July 14, 2017, Father indicated that he and Mother were living in his travel trailer and that he could not afford to pay the fees he needed to pay to get his commercial driver's license reinstated. The trial court and Father had the following exchange:

| | |
|---|---|
| [THE COURT]: | Now, sir, I denied your application for attorney's fee. The second part of the admonition is to tell you you always have a right to claim counsel if you're indigent, because you had put down that you had a monthly income of about 2800 and no minor children other than this one. And you didn't qualify as an indigent. What's your monthly income? |
| [FATHER]: | It averages, because I'm on a commission type of sales. |
| THE COURT: | How much have you made in the last three months? |
| [FATHER]: | I don't even know. I mean, I'd have to go look, look back and see what all I sold. |
| THE COURT: | Do you keep records? Do you keep a computer? Is it— |
| [FATHER]: | Somewhat. I have handwritten records. |
| THE COURT: | Okay. Are you spending the money— |
| [FATHER]: | When I was out at the flea market at that house that I just moved from, I kept real good records. |
| THE COURT: | Well, what did they show you were making on a monthly basis? |

[FATHER]: Well, I worked for the rent. I put in hours towards the rent. I sold out of the booths on Sundays, and I averaged, you know, 4– to 600 on that day. Then I have Internet sales during the week, which vary. Hundred, 200, you know, 50 here, 25 there.

THE COURT: Are you getting a commission, or are you just buying and selling?

[FATHER]: I'm buying and selling, but I give myself a percentage.

THE COURT: Cut.

[FATHER]: And the rest I got to roll back. This way I can buy more product, you know. So this way I always have my inventory.

THE COURT: Have you tried to get an attorney?

[FATHER]: I talked to Steve last week when he was here, Steve Wohr.

THE COURT: Okay.

[FATHER]: And he told me come on by. But he was my family attorney when I took my son's mother to court in '97. . . . Anyway, he told me come on by and talk to him, but—

THE COURT: Have you?

[FATHER]: No. I know he's retainer. So I . . . wanted . . . to have the retainer before I went and talked to him. So I just kind of—the $750 I just didn't have because [of] my truck problems. So—and I'll be honest with you. I know it don't have to be said, but I'll say it. I got arrested two weeks ago, day before court, two days before court for driving with a suspended license. And the truck is impounded still, but I have to get it out. It's $425 to get it out. I . . . need the truck out. I have most of it in my pocket— not in my pocket but in my pocket at home. I just

27

spent some on the court fees downstairs. But I need that truck out.

THE COURT: We will take it up again at the status hearing and see where you stand because you're right on the cusp. And . . . if you're able to get your truck out and get a retainer up to Mr. Wohr and all that type of thing, well, that's one route. If on the other hand—it looks like your monthly income is dropping. I may re-evaluate whether you get a court-appointed attorney or not, but we'll take that up later. Okay?

But understand you have the right to seek a court-appointed attorney and file a new financial affidavit at any time. If you do that, you can get one from my bailiff. Better way to do it is to go to the DA's office and get it, fill it out. And typically it's the DA. . . .

. . . .

THE COURT: If you think you're indigent, because they have to look it over and just tell me whether they agree or leave it to my discretion.

. . . .

THE COURT: That's how it goes. You get the form from them. You fill it out. You hand it back to them. Then they tell you whether you think we need a hearing or not. So—

[FATHER]: I'll try and retain one.

THE COURT: Anyway, you have that right at any time and, I will reconsider an application at any time if you, you know, can't retain private counsel and your Internet sales and other things seem to fall apart. . . .

. . . .

And I've already advised you, but I redo it that there's a status hearing on August 10th, 2017 at 1:00 p.m. You need to be here at that.

28

. . . .

[FATHER]:          Thank you, Your Honor.

### b.     If a Live Status Hearing Occurred in August 2017, Father Did Not Participate.

On August 7, 2017, the court coordinator issued a notice that the status hearing was reset for August 16, 2017. It is unclear from the record whether Father received that notice. It is also unclear whether a live status hearing occurred on August 16, 2017. Father did not sign the August 16, 2017 status hearing order, and on it, all of the boxes related to his appearance or absence from the status hearing are blank, as shown by this excerpt from the status hearing order:

Respondent Alleged Father, . . . , father of [Sallie]

☐ appeared in person and announced ready.
☐ appeared through attorney of record _____ and announced ready.
☐ appeared in person and through attorney of record _____ and announced ready.
☐ waived issuance and service of citation by waiver duly filed.
☐ agreed to the terms of this order as evidenced by signature below.
☐ although duly and properly notified, did not appear and wholly made default.
☐ was not notified, and did not appear.

The status hearing order gave notice to the parties that the Initial Permanency Hearing was set for December 6, 2017.

### c.     Father Did Not Assert His Indigence at the December 2017 Initial Permanency Hearing.

At the December 6, 2017 Initial Permanency Hearing, the trial court once again asked Father about his status and once again informed him that he could fill out another application for appointed counsel:

29

| | |
|---|---|
| [THE COURT]: | Now, sir, at one point you applied for an attorney, court-appointed attorney, and I denied it because you had an income. And I heard today that you have a job. |
| [FATHER]: | Yeah. |
| THE COURT: | Do you know how much you're making a month? |
| [FATHER]: | No. I work for myself. It all depends. But I've got financials from my last three months, and this job pays 3,000. |
| THE COURT: | Okay. Well, what I'm saying is—let me finish—if you feel that you are indigent and cannot afford an attorney, you are free to file an application for a court-appointed attorney at any time. Just come up to the DA's office. . . . You see that lady back there in the last row? You can just ask for her[;] . . . her name is Mrs. F[.] And she'll get you an application. Then you can fill it out and present it to this court, because these cases are very serious, and you do have a right to court-appointed counsel if you can't afford one. |

Father did not file another rule 145 affidavit.

### d. After an Almost Eleven-Month Absence from the Trial Court, Father Appeared in the Trial Court Again, Submitted a New Affidavit, and the Trial Court Appointed Trial Counsel.

"[A]lthough duly and properly notified, [Father] did not appear" at the March 28, 2018 Permanency Hearing or the July 18, 2018 Permanency Hearing. At the October 31, 2018 Permanency Hearing, the following occurred:

| | |
|---|---|
| THE COURT: | You don't have counsel; is that correct? |
| [FATHER]: | No. And I need somebody. |

30

THE COURT:     What?

[FATHER]:      I'm requesting one.

THE COURT:     Now?

[FATHER]:      I don't know—well, I tried to and past that I thought once I got Bonny Haynes, I thought she was going to take over for both cases, I was just informed she wasn't.[5]    And I figured it was just going to be—I mean, ad litem and everybody else has—you know, I know there's two separate cases, but it seems like everything is one, and I don't have to do two parent classes, I don't have two—why do I have to have two lawyers?  I don't understand that at all.  But I need a lawyer.  If it's still available.  If not, then I'll deal with it.

THE COURT:     Are you willing to proceed today without a lawyer?

[FATHER]:      Not if one's available.

THE COURT:     Okay.  And I'm trying to—we did appoint Bonny Haynes in the other case, correct?

[PROSECUTOR]:  Yes, Your Honor.

THE COURT:     And I cannot recall—I don't think he asked in this case previous.

[FATHER]:      I did.  I missed that—I'm sorry.  I missed that court date.  The day I was going to come in, we missed, and then the next one is just set for trial in June.

THE COURT:     I remember at the beginning of this case we didn't think you qualified because you had a job.

---

[5]Apparently, Bonny Haynes had been appointed to represent Father in proceedings regarding Annie, who was born in August 2018 and placed as a newborn with the Fosters and Sallie.

31

[FATHER]: Then it changed.

[PROSECUTOR]: I would like to proceed with today's hearing, Your Honor.

THE COURT: You may want to, but then we just got built in reversible error. So get me the application.

[PROSECUTOR]: I have copies if you don't have them.

THE COURT: We will proceed as to the mother if she has counsel, but no more questions of him.

. . . .

THE COURT: Because I was concerned since he's not represented by counsel . . . . [W]e'll recess the hearing[ and] do the next one.

But in the interim, sir, you need to fill that out.

And has Ms. Haynes for some reason decided not to be in this case?

[PROSECUTOR]: She was just never appointed, Your Honor.

THE COURT: Okay.

[FATHER]: She is willing now.

THE COURT: What?

[FATHER]: She is willing.

THE COURT: Okay. Well, we're recessing this hearing. We'll come back in—the next time.

(RECESS)

THE COURT: Okay. We're reconvening [Sallie's] case.

[Father], you've been sworn, correct?

[FATHER]: Yes.

32

THE COURT:       And all the statements you've made in this application for court-appointed attorney are true and correct?

[FATHER]:        Yes.

. . . .

THE COURT:       Okay.  I find you do qualify for [a] court-appointed attorney.  There's an ancillary parallel matter.  I will appoint Bonny Haynes, your attorney.

[FATHER]:        Okay.

. . . .

[PROSECUTOR]:    Your Honor, I feel compelled to state this for the record.  We are set for trial in 40 days.

THE COURT:       I know.

[PROSECUTOR]:    And there are no—there is no room for continuances or anything else. And so if . . . [Father] think[s he is] going to delay trial by . . . requesting counsel at this late date, it statutorily cannot happen.

[FATHER]:        That is not what's going on here.

THE COURT:       Well, no, and Bonny Haynes I'm—since she was in the other case, that's not a basis.  I'm not prejudging, but I think she's familiar with th[e] facts of this case and this client.

[PROSECUTOR]     Yes, Your Honor.

THE COURT:       The—and 40 days is barely enough.

. . . .

THE COURT:       Okay.   Going outside the wheel because of the situation.  All right.  Because Ms. Hay[n]es has sa[id] she would[.]

33

[FATHER]:        And I'm not trying to postpone nothing.  I want it
                 done immediately as quick as we can.

THE COURT:       It is.  There's the order. . . .

. . . .

THE COURT:       And I have appointed Bonny Haynes [as Father's
                 Trial Counsel] . . . .

Father's new affidavit showed that he was employed, had no assets, received a three-digit monthly income that is not completely decipherable to this court but may be $800, and had monthly expenses of $690.

## 2.    Evidence Supports the Trial Court's Decision; No Due-Process Violation or Abuse of Discretion Occurred.

Father contends that the trial court denied him Trial Counsel for fifteen months during critical stages of the termination proceeding.  He argues that the trial court "did not seem to understand" that he had reported his "gross receipts" on his original application and that the trial court "misread" the application by focusing on the top figure in the range of income Father had listed.  Father also discusses cost of goods sold, business expenses, and self-employment tax, matters not raised in the rule 145 affidavit or by Father when the trial court ruled and therefore matters we will not consider in resolving this issue.  *See M-I L.L.C.*, 505 S.W.3d at 574.  Father ignores the span of almost eleven months in which he failed to appear before the trial court, just as he ignored the trial court's repeated entreaties to update his rule 145 affidavit.  Given the initial conflicting evidence before the trial court and Father's repeated failures to assert his indigence by filing an updated rule 145 affidavit, we cannot

34

conclude that the trial court abused its discretion by failing to appoint Trial Counsel before the October 31, 2018 hearing and Father's filing of a revised affidavit. Nor can we conclude that the appointment of Trial Counsel, who the record indicates was already familiar with the parties and the issues, came so late that its timing (forty days before trial) was an abuse of discretion. Because the trial court appointed Trial Counsel when Father satisfied his burden to assert and prove indigence, we also cannot conclude that Father's due-process rights were violated by the appointment so late in the case. *See K.J. v. Tex. Dep't of Fam. and Protective Servs.*, No. 03-18-00556-CV, 2018 WL 6816795, at *2 (Tex. App.—Austin Dec. 28, 2018, pet. denied) (mem. op.). Rather than being denied counsel during critical stages, Father did not take the requisite steps to obtain appointed counsel until the day the trial court appointed Trial Counsel. We overrule this subissue.

### B. The Trial Court's Failure to Have a Jury Trial or to Submit a Jury Question on Conservatorship Was Not Reversible Error.

In the third subissue within his first issue, Father contends that the trial court's denial of a jury trial on conservatorship was an abuse of discretion and violated the Separation of Powers Clause. Father appears to be arguing that the presence of a conservatorship question in the jury charge might have swayed the jury to decline to terminate his rights. As we have previously held, "[i]n parental termination cases, the controlling question is whether the relationship between the parent and . . . child should be terminated." *In re J.T.G.*, 121 S.W.3d 117, 129 (Tex. App.—Fort Worth

35

2003, no pet.) (relying on *Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990) (op. on reh'g)). Thus, "the trial court does not abuse its discretion in refusing to submit to the jury a question concerning conservatorship even when the issue is properly pleaded or tried by consent." *In re A.W.*, No. 05-13-01674-CV, 2014 WL 1410545, at *2 (Tex. App.—Dallas Apr. 10, 2014, pet. denied) (mem. op.)

The jury here was properly charged on the termination issues; therefore, the trial court did not abuse its discretion by refusing to charge the jury on conservatorship. *See In re R.M.P.*, No. 04-17-00666-CV, 2018 WL 2976451, at *4 (Tex. App.—San Antonio June 13, 2018, pet. denied) (mem. op.); *In re A.D.H.–G.*, No. 12-16-00001-CV, 2016 WL 3182610, at *4 (Tex. App.—Tyler June 8, 2016, no pet.) (mem. op.); *E.A. v. Tex. Dep't of Fam. and Protective Servs.*, No. 03-15-00811-CV, 2016 WL 1639847, at *4 (Tex. App.—Austin Apr. 21, 2016, pet. denied) (mem. op.); *A.W.*, 2014 WL 1410545, at *2; *In re C.G.*, No. 05-13-1552-CV, 2014 WL 1022323, at *1 (Tex. App.—Dallas Mar. 11, 2014, no pet.) (mem. op.); *J.A.B. v. Tex. Dep't of Fam. and Protective Servs.*, No. 03-13-00273-CV, 2013 WL 4487513, at *2 (Tex. App.—Austin Aug. 14, 2013, pet. denied) (mem. op.); *Ayala v. Tex. Dep't of Fam. and Protective Servs.*, No. 03-09-00121-CV, 2010 WL 3672351, at *4 (Tex. App.—Austin Sept. 16, 2010, no pet.) (mem. op.).

Further, in this appeal, we are affirming the trial court's order terminating Father's relationship with Sallie despite the evidence about a potential placement with Addie. He is therefore a former parent with no legal relationship to Sallie and no

36

standing to challenge the trial court's post-termination naming of TDFPS as Sallie's PMC or to invoke the trial court's continuing jurisdiction over managing conservatorship issues. *See* Tex. Fam. Code Ann. § 161.206(b); *Y.V.*, 2013 WL 2631431, at *1. He therefore lacks standing to argue that the jury should have been charged on managing conservatorship after finding the parents' parental rights should be terminated. *See In re K.T.*, No. 02-14-00392-CV, 2015 WL 3460979, at *19 (Tex. App.—Fort Worth May 28, 2015, no pet.) (mem. op.); *Y.V.*, 2013 WL 2631431, at *2; *H.M.M.*, 230 S.W.3d at 204–05; *In re Lambert*, 993 S.W.2d 123, 132 (Tex. App.—San Antonio 1999, orig. proceeding) ("Former parents do not have standing to invoke the trial court's continuing jurisdiction over managing conservatorship issues."). That is, we are not going to both affirm the termination of Father's rights and send the case back to a jury to determine conservatorship for Sallie when the only appellants no longer have a legal relationship with her.

Alternatively, in his fourth subissue, Father argues that the trial court's error probably caused the rendition of an improper judgment. Even if the trial court did err by not allowing the jury the opportunity to resolve the conservatorship issue, which we do not hold, the jury properly would not have reached that issue because they terminated Father's rights. Father is therefore unable to show harm. *See* Tex. R. App. P. 44.1(a); *R.M.P.*, 2018 WL 2976451, at *4.

Finally, we note that the trial court's termination order does not expressly prohibit Sallie's future placement with Addie. *See* Tex. Fam. Code Ann. § 153.371(11);

*K.T.*, 2015 WL 3460979, at *18 n.20; *cf. B.O.*, 2017 WL 2590571, at *29 n.31 ("[W]hile we do not reach the issue of whether a non-parent non-party may be appointed as a child's sole managing conservator in a termination suit, which appears to be an issue of first impression in this court, several of our sister courts have addressed the issue and agreed that in a suit brought by DFPS, *a trial court can appoint a non-parent non-party as a child's sole managing conservator* when there is some evidence of a substantive and probative character to support the trial court's decision, as supported by the relevant family code provisions and DFPS's pleadings and actions." (emphasis added)) (citing referenced cases).

We overrule Father's third and fourth subissues.

## C.    Father Has Not Proved Ineffective Assistance of Trial Counsel.

### 1.    We Apply the *Strickland* Standard, Not the *Cronic* Standard.

In his second subissue, Father contends Trial Counsel provided ineffective assistance of counsel. An indigent parent's statutory right to counsel in a TDFPS-filed parental termination case, Tex. Fam. Code Ann. § 107.013(a), includes the right to effective assistance of counsel. *M.S.*, 115 S.W.3d at 544. To satisfy his burden of proving that Trial Counsel was ineffective, Father must show (1) that Trial Counsel failed to perform in a reasonably effective manner and (2) that "the deficient performance prejudiced [his case], which requires showing that counsel's errors were so serious as to deprive [Father] of a fair trial, a trial whose result is reliable." *H.R.M.*,

38

209 S.W.3d at 111 (internal quotation marks and citation omitted); *see Strickland v. Washington*, 466 U.S. 668, 687–88, 104 S. Ct. 2052, 2064 (1984).[6]

### 2. Father Has Not Met His Burden of Proving Either Prong.

Father contends Trial Counsel was ineffective because she:

- failed to move that TDFPS have a shorter time to respond to discovery;

- failed to file a counterpetition or plead some type of "affirmative defense" requesting that Sallie be placed with her half-brother's paternal aunt Addie;[7]

- failed to object to "surprise" and "prejudice" when TDFPS and the Fosters orally waived their requests for the appointment of a managing conservator;

- failed to request a trial amendment that Addie be appointed managing conservator;

- failed to timely object to the Fosters' amended petition in intervention, their participation at trial, and their alleged improper voir dire and jury argument;

- failed to object to Sallie's attorney ad litem's performance;

---

[6] In his subissue alleging the denial of counsel, Father alleges that a presumption of prejudice under *United States v. Cronic*, 466 U.S. 648, 659, 104 S. Ct. 2039, 2047 (1984), may apply. Because we held that the trial court did not abuse its discretion by appointing Trial Counsel in the October 31, 2018 hearing, and based on our rationale expressed in *In re S.B.*, No. 02-18-00310-CV, 2019 WL 1388760, at *15 (Tex. App.—Fort Worth March 28, 2019, no pet. h.) (mem. op.), we do not presume prejudice in this case, where Trial Counsel participated in all phases of the trial, cross-examining adverse witnesses and examining her own, and challenging adverse evidence and offering her own.

[7] Trial Counsel filed a proposed charge seeking the conservatorship finding Father argues about on appeal; the issue was therefore before the trial court.

- failed to impeach the conservatorship workers on the placement issue;

- failed to offer Addie's home study at trial; and

- failed to object to the trial court's forbidding the use of the word "placement" in oral argument.

Father raised ineffective assistance of Trial Counsel in his motion for new trial, but he only included a couple of these allegations in that motion, and although there was a hearing on the motion, no ineffective-assistance issues were discussed.

"We may not speculate to find trial counsel ineffective when the record is silent regarding counsel's reasons for [her] actions." *In re F.L.H. IV*, No. 04-17-00425-CV, 2017 WL 6597829, at *15 (Tex. App.—San Antonio Dec. 27, 2017, pet. denied) (mem. op.) (quoting *Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 623 (Tex. App.—Houston [1st Dist.] 2009, pet. denied)). Absent evidence for Trial Counsel's decisions, we cannot conclude that Father has "overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance." *Id.* (quoting *M.S.*, 115 S.W.3d at 545) (internal quotation marks omitted); *see Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065.

Father also failed to show that but for Trial Counsel's alleged ineffective performance, the results of the proceedings would have been different. *See Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068–69. Father did not preserve any complaint regarding the jury's statutory findings under subsections (D), (E), (N), and (O), he conceded the evidence is legally and factually sufficient to support the jury finding on

40

the subsection (O) allegations by clear and convincing evidence, and we have pointed out in the interest of justice that the evidence is also legally and factually sufficient to support the endangerment findings under subsections (D) and (E) by clear and convincing evidence. We have additionally held that the evidence is legally and factually sufficient to support the best-interest finding against Father. Father offers no explanation of how the jury findings or trial court's judgment terminating his parental rights—the controlling issue in this case—would have changed had Trial Counsel performed differently. We also note that the errors Father complains of relate to the issue on which he, a terminated and therefore former parent, has no standing. *See* Tex. Fam. Code Ann. § 161.206(b); *Y.V.*, 2013 WL 2631431, at *1.

Because Father failed to show that the results would have been different if Trial Counsel had not made the alleged errors listed in his brief, he has failed to meet *Strickland*'s second prong as well. *See Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069; *In re L.M.*, No. 02-17-00421-CV, at *12 (Tex. App.—Fort Worth May 3, 2018, no pet.) (mem. op.) (holding that a father who endangered his children by supplying the other parent with methamphetamine while she was pregnant and by using drugs during the pendency of the case could not show that his counsel's performance affected the termination of his parental rights); *F.L.H. IV*, 2017 WL 6597829, at *15.

### 3. Father Cannot Complain of Mother's or Sallie's Counsel's Performance.

To the extent Father also complains of Mother's trial counsel's performance or Sallie's attorney ad litem's performance, he has no standing to do so. *See Torrington Co. v. Stutzman*, 46 S.W.3d 829, 843 (Tex. 2000); *J.R. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-15-00108-CV, 2015 WL 4603943, at *3 (Tex. App.—Austin July 30, 2015, pet. denied) (mem. op.); *T.N.*, 142 S.W.3d at 524.

### 4. Father Did Not Prove Ineffective Assistance of Trial Counsel.

Because Father did not prove that Trial Counsel provided ineffective assistance of counsel, we overrule his second subissue, the only remaining portion of his first issue.

### CONCLUSION

Having overruled Father's two issues, we affirm the trial court's judgment against him. Because Mother did not challenge the termination of her parental rights, we dismiss her appeal.

/s/ Mark T. Pittman
Mark T. Pittman
Justice

Delivered: June 13, 2019